## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BERKLEY REGIONAL SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 8:17-cv-00357 |
| vs. | ) ) | |
| PERFORMANCE ROOFING AND SHEET METAL, INC.; JIM LaHOOD CONSTRUCTION, INC., and OSC, LLC d/b/a OMAHA SURGICAL CENTER, | ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) ) | |

Plaintiff Berkley Regional Specialty Insurance Company ("BRSIC"), pursuant to Federal Rules of Civil Procedure 8(a) and 57 and 28 U.S.C. §§ 2201(a) and 2202, for its Complaint for Declaratory Judgment against Defendants Performance Roofing and Sheet Metal, Inc. ("Performance Roofing"), Jim LaHood Construction, Inc. ("LaHood"), and OSC, LLC d/b/a Omaha Surgical Center ("OSC") (collectively, the "Defendants"), states and alleges as follows:

### THE PARTIES

1.     BRSIC is, and at all times relevant hereto was, a corporation organized under the laws of Delaware with its principal place of business in Scottsdale, Arizona.  At all times relevant hereto, BRSIC was duly authorized to carry on the business of insurance in Nebraska.

2.     At all times relevant hereto, Performance Roofing was a corporation organized under the laws of Nebraska with its principal place of business located in Omaha, Nebraska.

3.     At all times relevant hereto, LaHood was a corporation organized under the laws of Nebraska with its principal place of business located in Omaha, Nebraska.

4.     At all times relevant hereto, OSC was a limited liability company organized under the laws of Nebraska with its principal place of business located in Omaha, Nebraska.  OSC is comprised of the following members:

    a.     James Quinn, who, at all relevant times, was a citizen of Nebraska.

    b.     Thomas Pruse, who, at all relevant times, was a citizen of Nebraska.

    c.     Thomas Besse, who, at all relevant times, was a citizen of Nebraska.

    d.     David Minard, who, on information and belief, is now deceased, but who, at all relevant times was a citizen of Nebraska.

    e.     William Schlichtemeier, who, at all relevant times, was a citizen of Nebraska.

    f.     Daniel Rietz, who, on information and belief, is now deceased, but who, at all relevant times was a citizen of Nebraska.

    g.     Herbert Crowley, who, at all relevant times, was a citizen of Nebraska.

    h.     Richert Taylor, who, on information and belief, is now deceased, but who, at all relevant times was a citizen of Nebraska.

    i.     Robert Hilkemann, who, at all relevant times, was a citizen of Nebraska.

    j.     John Edney, who, at all relevant times, was a citizen of Nebraska.

    k.     Ernest Chupp, who, at all relevant times, was a citizen of Minnesota.

    l.     John Fitzpatrick, who, at all relevant times, was a citizen of Nebraska.

    m.     Mary Kratoska, who, on information and belief, is now deceased, but who, at all relevant times was a citizen of Nebraska.

    n.     James Cummins, who, at all relevant times, was a citizen of Oklahoma.

    o.     Alan Selander, who, at all relevant times, was a citizen of Georgia.

      p.      David Underwood, who, at all relevant times, was a citizen of Nebraska.

      q.      Thomas Whitmore, who, at all relevant times, was a citizen of Nebraska.

## JURISDICTION

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) in that the citizenship of the parties is completely diverse and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## VENUE

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this litigation occurred in this judicial district, and because at least one of the defendants is a resident of this judicial district and all defendants are residents of the State of Nebraska.

## FACTUAL BACKGROUND

**The *OSC* Lawsuit**

7.      On or about January 24, 2017, OSC filed a Complaint against LaHood and Performance Roofing in the District Court of Douglas County, Nebraska, under case number CI 17-609 ("*OSC* Lawsuit"). (A copy of the Complaint in the *OSC* Lawsuit is attached hereto as **Exhibit A** and incorporated herein by reference.)

8.      The *OSC* Lawsuit alleges that OSC is an outpatient surgical center that operates at the property located at 8051 West Center Road, Omaha, Nebraska 68124 ("Property"). (Ex. A, ¶¶ 2, 9.)

9.      The *OSC* Lawsuit alleges that the Property includes at least seven operating rooms in which surgeons perform procedures related to ophthalmology, podiatry, maxillofacial surgery, and other specialties. (Ex. A, ¶ 9.)

10.     The *OSC* Lawsuit further alleges that other rooms at the Property contain sterile medical supplies, serve as pre- and post-op rooms, function as a waiting room, or serve other purposes.  (Ex. A, ¶ 10.)

11.     The *OSC* Lawsuit alleges that two machines located at the Property are the Laser Machine (used for performing cataracts procedures) and the Lasik Machine (used for performing Lasik surgeries).  (Ex. A, ¶ 11.)

12.     The *OSC* Lawsuit alleges that, on or about March 9, 2016, OSC and LaHood executed a contract ("OSC-LaHood Contract") to replace the roof on the main building of the Property and to make additional repairs on the Property's east addition.  (Ex. A, ¶ 12.)

13.     The *OSC* Lawsuit alleges that the OSC-LaHood Contract provided that all work would be completed "in a workmanlike type manner according to standard practices."  (Ex. A, ¶ 13.)

14.     The *OSC* Lawsuit further alleges that, under Nebraska law, every construction contract is a covenant that construction work will be completed in a good and workmanlike manner. (Ex. A, ¶ 14.)

15.     The *OSC* Lawsuit alleges that a "good and workmanlike standard" requires, among other things, that a roofing contractor must secure the roof and protect the building and its contents so as to prevent water intrusion into the building.  (Ex. A, ¶ 15.)

16.     The *OSC* Lawsuit alleges that, on or about April 15, 2016, LaHood executed an oral subcontract with Performance Roofing whereby Performance Roofing was to perform all roof work on the Property ("LaHood-Performance Roofing Subcontract").  (Ex. A, ¶ 16.)

17.     The *OSC* Lawsuit alleges that OSC had no knowledge of the LaHood-Performance Roofing Subcontract.  (Ex. A, ¶ 16.)

18.     The *OSC* Lawsuit alleges that, based on the LaHood-Performance Roofing Subcontract, Performance Roofing assumed all of LaHood's duties and obligations under the OSC-LaHood Contract, including the implied duty to complete the roofing work in a good and workmanlike manner.  (Ex. A, ¶ 17.)

19.     The *OSC* Lawsuit further alleges that, contemporaneous with the LaHood-Performance Roofing Subcontract, Performance Roofing executed a "Subcontractor Agreement for Insurance, Indemnification, and Hold Harmless," which stated that Performance Roofing would name LaHood as an additional insured on its insurance policy.  (Ex. A, ¶ 17.)

20.     The *OSC* Lawsuit alleges that OSC "was a known and intended third-party beneficiary of the [LaHood-Performance Roofing] Subcontract, because the rights and interests of OSC were contemplated in creation of the [LaHood-Performance Roofing] Subcontract and provisions were made for OSC in the Subcontract."  (Ex. A, ¶ 18.)

21.     The *OSC* Lawsuit further alleges that OSC "was a known and intended third-party beneficiary of the Indemnity Agreement, because the rights and interests of OSC were contemplated in creation of the Indemnity Agreement and provisions were made for OSC in the Indemnity Agreement."  (Ex. A, ¶ 19.)

22.     The *OSC* Lawsuit alleges that, under the Indemnity Agreement, Performance Roofing was obligated to indemnify OSC for damages, losses, and expenses for property damage from Performance Roofing's acts, omissions, breaches, or defaults in connection with its work. (Ex. A, ¶ 20.)

23.     The *OSC* Lawsuit alleges that, on or about June 15, 2016, Performance Roofing arrived at the Property, which was the first time that OSC learned that Performance Roofing and not LaHood would be performing the roof work.  (Ex. A, ¶ 21.)

24.     The *OSC* Lawsuit further alleges that Performance Roofing informed OSC that the roof work would take two to three weeks and would be done in sections.  (Ex. A, ¶ 22.)

25.     The *OSC* Lawsuit alleges that, as part of the roof work it was performing, Performance Roofing was obligated to protect and cover all openings that it had created during the course of its work so that water would not intrude into the building.  (Ex. A, ¶ 23.)

26.     The *OSC* Lawsuit further alleges that, on June 18, 2016, a rainfall occurred in the vicinity of the Property.  (Ex. A, ¶ 24.)

27.     The *OSC* Lawsuit alleges that Performance Roofing "failed to seal or otherwise cover the openings it had created with adequate protection from water intrusion," thereby allowing water to leak into the interior of the building, causing damage.  (Ex. A, ¶ 25.)

28.     The *OSC* Lawsuit further alleges that Performance continued to fail to adequately protect the Property from water intrusion, allowing water to leak into the interior of the building and causing damages on "at least June 21 & 29, 2016, and July 2, 7, 12, 13 and 16, 2016." (Ex. A, ¶ 26.)

29.     The *OSC* Lawsuit alleges that the roof work performed by Performance Roofing "was done negligently, not in a good and workmanlike manner and not consistent with applicable standard practices."  (Ex. A, ¶ 28.)

30.     The *OSC* Lawsuit alleges that, as a direct result of LaHood's and Performance Roofing's negligence and failure to complete their work in a good and workmanlike manner and consistent with industry standards, OSC suffered extensive damages and losses, including: (a) $33,000 for costs of repair to the Property, including repair of ceilings, cleanup costs, employee wages, and testing and medical equipment that was exposed to moisture; (b) $895,000 to replace the Laser Machine and necessary accessories that were destroyed by exposure to

moisture, as well as the costs to replace the Lasik Machine and necessary accessories; and (c) $272,000 in lost profits.  (Ex. A, ¶ 29.)

31.     The *OSC* Lawsuit alleges that, on or about July 27, 2016, OSC gave notice of its damages and made claims to LaHood's and Performance Roofing's insurers.  (Ex. A, ¶ 30.)

32.     The *OSC* Lawsuit alleges that, on or about August 4, 2016, LaHood informed OSC that the roof work was substantially completed and invoiced OSC $90,400 for work performed under the OSC-LaHood Contract.  (Ex. A, ¶ 31.)

33.     The *OSC* Lawsuit alleges that OSC, Performance Roofing, and LaHood subsequently came to an interim agreement whereby OSC agreed to pay, with all rights reserved, the suppliers and crane providers that Performance Roofing and LaHood used to perform the work as well as a portion of the contract price to LaHood and Performance Roofing.  (Ex. A, ¶ 32.)

34.     The *OSC* Lawsuit alleges that, consistent with this interim agreement, OSC agreed to pursue Performance Roofing's and LaHood's insurance carriers on its claims and await a response from the carriers before taking further action; in turn, LaHood, Performance Roofing, and OSC agreed not to file suit against each other until Performance Roofing's and LaHood's insurance carriers responded.  (Ex. A, ¶ 32.)

35.     The *OSC* Lawsuit alleges that, thereafter, OSC issued various payments to Midwest Roofing Supply, Lift-All Crane Service, AB Refrigeration, Performance Roofing, and LaHood.  (Ex. A, ¶¶ 33-34.)

36.     The *OSC* Lawsuit alleges that OSC provided information to LaHood's and Performance Roofing's insurance carriers about the nature and extent of its damages and losses. (Ex. A, ¶ 35.)

37.     The *OSC* Lawsuit alleges that, on November 30, 2016, Performance Roofing's insurance carrier "rejected OSC's claim for damages in its entirety."  (Ex. A, ¶ 36.)

38.     The *OSC* Lawsuit further alleges that, on December 9, 2016, the insurance carrier for LaHood "rejected OSC's claim for damages in its entirety, without justification."  (Ex. A, ¶ 36.)

39.     Count I of the *OSC* Lawsuit asserts a claim for negligence against LaHood and Performance Roofing, specifically alleging that LaHood and Performance Roofing acted "negligently in one or more of the following ways: by failing to proceed with due care in accordance with the standards and customs prevailing in the roofing industry, by failing to perform in accordance with principles of good workmanship, by failing to complete the work in a good and workmanlike manner reasonably fit for the intended purpose, by failing to carry out the Roof Work at the Property by adequately protecting the roof, allowing water to intrude into the building; and by negligently causing damages and losses to the Property and OSC."  (Ex. A, ¶ 40.)

40.     Count II of the *OSC* Lawsuit asserts a claim for breach of contract against LaHood and Performance Roofing, specifically alleging that "LaHood breached the Contract with OSC by failing to provide the Roof Work in a good and workmanlike manner and reasonably fit for the intended purpose and by failing to properly protect the roof from water damage and leaks" and "Performance breached the Subcontract with LaHood, for which OSC has standing to sue as a third-party beneficiary, by failing to provide the Roof Work in a good and workmanlike manner and reasonably fit for the intended purpose, and failing to properly protect the roof from water damage and leaks."  (Ex. A, ¶¶ 48-49.)

41.     Count II of the *OSC* Lawsuit further asserts that Performance Roofing "breached the Indemnity Agreement with LaHood, for which OSC has standing to enforce as a third-party beneficiary, by failing to protect LaHood or OSC from damages, losses and expenses for property damage from acts, omissions, breach or default in connection with Performance's work." (Ex. A, ¶ 50.)

## The *LaHood* Crossclaim

42.     On or about March 23, 2017, LaHood filed a crossclaim against Performance Roofing ("LaHood Crossclaim") in the *OSC* Lawsuit.  (A copy of the LaHood Crossclaim is attached hereto as **Exhibit B** and incorporated herein by reference.)

43.     The LaHood Crossclaim alleges that LaHood "exercised no control, direction, supervision, management, or monitoring of Defendant Performance Roofing's Roof Work such that it is not liable for Defendant Performance Roofing's alleged negligence or alleged breach of contract." (Ex. B, ¶ 57.)

44.     The LaHood Crossclaim asserts that, "[i]f Defendant Performance Roofing is found to be negligent as alleged by Plaintiff in its first claim for relief . . . , Defendant Performance Roofing is solely and exclusively liable for such negligence, and the alleged damages stemming therefrom."  (Ex. B, ¶ 58.)

45.     The LaHood Crossclaim asserts that "[i]f Defendant Performance Roofing is found to be in breach of contract as alleged by Plaintiff in its second claim for relief . . . , Defendant Performance Roofing is solely and exclusively liable for such breach of contract, and the alleged damages stemming therefrom."  (Ex. B, ¶ 59.)

46.     The LaHood Crossclaim asserts that "if Defendant Performance Roofing is liable for negligence as alleged by Plaintiff in its first claim for relief . . . , Defendant Performance Roofing is in breach of the Subcontract and Indemnity Agreement with Defendant LaHood

Construction.    Defendant  Performance  Roofing  owes  damages  to  Defendant  LaHood

Construction for the breach of one or both of those contracts."  (Ex. B, ¶ 60.)

### THE BRSIC POLICY

47.    BRSIC  issued  a  commercial  general  liability  insurance  policy  to  Performance

Roofing  under  policy  number  CGL 0072456-22  for  the  policy  period  of  February 3, 2016  to

February 3, 2017 ("BRSIC Policy").  The BRSIC Policy is subject to a per "occurrence" limit of

$1,000,000  and  a  general  aggregate  limit  of  $2,000,000.    (A copy  of  the  BRSIC  Policy  is

attached hereto as **Exhibit C** and incorporated herein by reference.)

### COUNT I

### THE "CONDITIONAL EXCLUSION – WEATHER-RELATED PROPERTY DAMAGE (ROOFING OPERATIONS)" BARS COVERAGE

48.    BRSIC  adopts  and  realleges  the  allegations  in  paragraphs  1  through  47  of  its

Complaint for Declaratory Judgment as paragraph 48 of Count I of its Complaint for Declaratory

Judgment.

49.    Coverage A of the BRSIC Policy provides, in relevant part, the following with

respect to the liability coverage afforded therein for "bodily injury" and "property damage":

**SECTION I – COVERAGES**

**COVERAGE   A   BODILY   INJURY   AND   PROPERTY   DAMAGE LIABILITY**

**1.    Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

> **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and
>
> **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.
>
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.
>
> **b.** This insurance applies to "bodily injury" and "property damage" only if:
>
> > **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
> >
> > **(2)** The "bodily injury" or "property damage" occurs during the policy period . . . [.]
>
> * * *

(*See* Ex. C.)

50. The BRSIC Policy defines the terms "occurrence" and "property damage" as follows:

## SECTION V – DEFINITIONS
* * *

> **13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> * * *
>
> **17.** "Property damage" means:
>
> > **a.** Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> >
> > **b.** Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
>
> For the purposes of this insurance, electronic data is not tangible property.

11

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

\* \* \*

(*See* Ex. C.)

51.     The BRSIC Policy also contains the following endorsement:

### CONDITIONAL EXCLUSION – WEATHER-RELATED PROPERTY DAMAGE (ROOFING OPERATIONS)

This Endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.      The following is added to Section IV – Commercial General Liability Conditions:

Coverage only applies to liability arising out of work performed by or on behalf of any insured when:

1.      "Appropriate" steps are taken to determine any approaching adverse weather; and

2.      "Appropriate" steps are taken to provide a temporary cover for an "open roof" which is reasonably able to protect against property damage caused by rain, snow, sleet, hail, ice, wind, freezing, or any other weather-related condition; and

3.      The temporary cover is properly designed and secured to prevent "property damage" caused by rain, snow, sleet, hail, ice, wind, freezing, or any other weather-related condition.

B.      The following exclusion is added to 2. Exclusions of Section I – Coverage A – Bodily Injury and Property Damage Liability:

This insurance does not apply to "property damage" for roofing operations conducted by or on behalf of any insured if:

1.      "Appropriate" steps have not been taken to determine any approaching adverse weather; and

2.      "Appropriate" steps have not been taken to provide a temporary cover for an "open roof" which is reasonably able to protect

12

against property damage caused by rain, snow, sleet, hail, ice, wind, freezing, or any other weather-related condition; and

3.  The temporary cover was not properly designed and secured to prevent "property damage" caused by rain, snow, sleet, hail, ice, wind, freezing, or any other weather-related condition.

C.  The following definitions are added to the Definitions section:

"Appropriate" means industry accepted practices used by contractors to protect or prevent "property damage" under similar circumstances.

"Open roof" means any roof or section where the protective covering (shingles, tar, felt paper, etc.) has been removed leaving the underlying materials, structure, shell, or structure interior exposed.

\* \* \*

(*See* Ex. C) (Hereinafter referred to as the "Open Roof Exclusion.")

52.  The *OSC* Lawsuit alleges that "[a] good and workmanlike standard and the applicable standard practices require, among other things, that during a construction project, a roofing contractor must secure the roof and protect the building and its contents so as to prevent water intrusion into the building because of any work performed by or openings made by such contractor."  (Ex. A, ¶ 15.)

53.  The *OSC* Lawsuit alleges "[a]s part of Performance's Roof Work, Performance was obligated to protect and cover all openings that it had created during the Roof Work, so that water would not intrude into the building."  (Ex. A, ¶ 23.)

54.  The *OSC* Lawsuit further alleges that "Performance failed to seal or otherwise cover the openings it had created with adequate protection from water intrusion.  As a result, during the First Weather Event, water leaked into the interior of the building and caused damages."  (Ex. A, ¶ 25.)

55.  The *OSC* Lawsuit alleges that Performance Roofing "continued to fail to adequately protect the building from water intrusion, and water also leaked into the interior of

13

the building and caused damages on at least June 21 & 29, 2016, and July 2, 7, 12, 13, and 16, 2016." (Ex. A, ¶ 26.)

56.     The *OSC* Lawsuit further alleges that "the Roof Work performed by Performance was done negligently, not in a good and workmanlike manner and not consistent with applicable standard practices." (Ex., A, ¶ 28.)

57.     The *OSC* Lawsuit alleges "[a]s a direct result of Performance's and LaHood's negligence and failures to complete the Roof Work in a good and workmanlike manner and consistent with applicable standard practices, OSC suffered extensive damages and losses . . . ." (Ex. A, ¶ 29.)

58.     The *OSC* Lawsuit alleges that Performance Roofing and LaHood acted negligently "by failing to proceed with due care in accordance with standards and customs prevailing in the roofing industry, by failing to perform in accordance with principles of good workmanship, by failing to complete the work in a good and workmanlike manner reasonably fit for the intended purpose, by failing to carry out the Roof Work at the Property by adequately protecting the roof, allowing water to intrude into the building; and by negligently causing damages and losses to the Property and OSC." (Ex. A, ¶ 40.)

59.     The *OSC* Lawsuit alleges that LaHood "breached the Contract with OSC . . . by failing to adequately protect the roof from water damage and leaks." (Ex. A, ¶ 48.)

60.     The *OSC* Lawsuit alleges that Performance Roofing also "fail[ed] to provide the Roof Work in a good and workmanlike manner and reasonably fit for the intended purpose, and failing to properly protect the roof from water damage and leaks." (Ex. A, ¶ 49.)

61.     The BRSIC Policy's Open Roof Exclusion bars coverage for the *OSC* Lawsuit and the LaHood Crossclaim because they arise from Performance Roofing's alleged failure to

take "appropriate" (i.e., conforming with roofing industry standards) steps to provide a temporary cover for an open roof and/or failed to properly design and secure a temporary cover to prevent "property damage."

62.     BRSIC has and had no duty under the BRSIC Policy to defend Performance Roofing against the *OSC* Lawsuit or the LaHood Crossclaim, or to indemnify Performance Roofing for any judgment or settlement entered in the *OSC* Lawsuit or LaHood Crossclaim.

63.     BRSIC has and had no duty under the BRSIC Policy to defend LaHood against the *OSC* Lawsuit or to indemnify LaHood for any judgment or settlement entered in the *OSC* Lawsuit.

64.     An actual controversy exists between BRSIC, Performance Roofing, LaHood, and OSC, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff BRSIC respectfully prays that this Honorable Court:

a.     Determine and adjudicate the rights and liabilities of the parties hereto with respect to the BRSIC Policy;

b.     Find and declare that the "Open Roof Exclusion" bars all coverage under the BRSIC Policy for the claims asserted in the *OSC* Lawsuit and the LaHood Crossclaim;

c.     Find and declare that BRSIC has and had no duty under the BRSIC Policy to defend Performance Roofing against the *OSC* Lawsuit or the LaHood Crossclaim, or to indemnify Performance Roofing for any judgment or settlement entered in the *OSC* Lawsuit or the LaHood Crossclaim;

d.     Find and declare that BRSIC has and had no duty under the BRSIC Policy to defend LaHood against the *OSC* Lawsuit, or to indemnify LaHood for any judgment or settlement entered in the *OSC* Lawsuit; and

e.     Grant BRSIC such other and further relief that the Court deems appropriate under the facts and circumstances.

## REQUEST FOR PLACE OF TRIAL

Pursuant to NECivR 40.1(b), BRSIC requests trial of the case in Omaha.

Dated this 25th day of September, 2017.

BERKLEY REGIONAL SPECIALTY
INSURANCE COMPANY, Plaintiff

By  s/ *Brooke H. McCarthy*
    Brooke H. McCarthy # 25077
    KUTAK ROCK LLP
    The Omaha Building
    1650 Farnam Street
    Omaha, NE  68102-2186
    (402) 346-6000 (Telephone)
    (402) 346-1148 (Facsimile)
    brooke.mccarthy@kutakrock.com